## AFFIDAVIT OF DEA SPECIAL AGENT SEAN GEARY

I, Sean Geary, Special Agent with the Drug Enforcement Administration, being duly sworn, depose and state as follows:

## INTRODUCTION

1.     I have been a Special Agent with the DEA since 2019. I am currently assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force, a multi-agency working group comprised of the DEA, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), the Federal Bureau of Investigation ("FBI"), Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other state and local agencies, whose mission is to identify, investigate, disrupt, and dismantle large-scale, violent drug trafficking organizations operating in the District of Massachusetts. Prior to my employment with DEA, I was employed as a Yarmouth, Massachusetts police officer for seven years.

2.     My responsibilities as a DEA Special Agent include the investigation of possible violations of federal law, including but not limited to violations of the Controlled Substances Act. As a Special Agent, I have participated in the investigations of criminal organizations involved in the distribution of controlled substances and related money laundering violations. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, acting in an undercover capacity, making arrests, and debriefing defendants, informants and witnesses who had personal knowledge about major drug trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. I have also received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotic traffickers to conceal and launder the proceeds of their narcotics-trafficking activities. Through my training and

experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

3.      Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephones numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

## PURPOSE OF AFFIDAVIT

4.      This affidavit is being submitted in support of a criminal complaint against the following individuals:

        (1)     Erison Jose CUELLO-NUNEZ, a/k/a "Chompi" ("CUELLO-NUNEZ");

        (2)     █████████████████████

        (3)     Roberto Toledo SANCHEZ;

        (4)     Wander Ernesto CUELLO ("WANDER"); and

        (5)     FNU LNU, a/k/a "Jose" ("JOSE")

charging that beginning at least in or about June 2022 and continuing until the present, did knowingly and intentionally combine, conspire, confederate, and agree with each other and others known and unknown, to possess with intent to distribute and to distribute controlled substances, including 50 grams or more of methamphetamine, a schedule I controlled substance and 400 grams

or more of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §846 (the "Target Offense").

5.   This affidavit is also being submitted in support of applications for search warrants for the following target locations, which are described in greater detail below and in attachments to the relevant warrant applications and warrants:

1) 1000 Harvard Street, Apt. 7, Mattapan, Massachusetts (hereinafter, "CUELLO-NUNEZ's residence" or "Target Location #1");

2) ███████████████████████████████████████

3) 73 Savon Street, Apt. 3, Roxbury, Massachusetts (hereinafter, "Target Location #3");

(collectively, the "Target Locations").

6.   This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the Target Subjects identified herein have committed the above-described controlled substance offense and that evidence, fruits, and instrumentalities of that offense will be found in the Target Locations as described below.

**Procedural History**

7.   On November 7, 2022, the Honorable Denise J. Casper, United States District Judge, District of Massachusetts, issued an Order authorizing investigators to intercept wire over cellular phones, including (617) 818-2015 (Target Telephone 1); (929) 823-4434 (Target Telephone 2); and (857) 701-8373 (Target Telephone 3), and intercept wire and electronic communications over (857) 258-6481 (Target Telephone 4).

8.   On November 23, 2022, Magistrate Judge Dein issued warrants authorizing investigators to obtain the precise location data for five cellular phones, including Target

Telephones 1, 3, and 4. [Dkt. Nos. 22-5387 through 5391-JGD]. The affidavit submitted in support of those warrants is incorporated by reference herein (the "November 23 Affidavit").

9.      On December 12, 2022, Judge Casper signed an Order authorizing the interception of wire and electronic communications over Target Telephones 1, 3, (857) 424-4645 (Target Telephone 6), (857) 251-1580 (Target Telephone 7), (617) 224-2940 (Target Telephone 8), Target Telephone 9, and ▬▬▬▬▬ (Target Telephone 10). On January 10, 2023, Judge Casper signed an Order (herein, the "January 10 Order") authorizing the continued interception of wire communications over Target Telephone 6 and the continued interception of wire and electronic communications over Target Telephones 7, 8, 9, and 10.

10.     On January 26, 2023, the Honorable Judith G. Magistrate Judge Dein issued warrants authorizing investigators to obtain location data for cellular phones, including Target Telephones 6, 7, 8, 9, and 10 [Dkt. Nos. 23-5026 to 5043-JGD]. The affidavit submitted in support of those warrants is incorporated by reference herein (the "January 26 Affidavit").

## Probable Cause

11.     In June 2022, the DEA Boston Strike Force began investigating a drug trafficking organization ("DTO") led by CUELLO-NUNEZ. Since interceptions over Target Telephones began on November 7, 2022, investigators have learned that the CUELLO-NUNEZ DTO is distributing fentanyl, methamphetamine, and cocaine. As detailed below, interceptions have led to drug seizures and surveillance that has confirmed that the targets are distributing vast quantities of methamphetamine, fentanyl, and cocaine, and are smuggling Dominican nationals across the Mexico border. The CUELLO-NUNEZ DTO uses the Spanish words for red ("roja"), black ("negra"), and brown ("marron"), "tina," and water ("agua") when directing couriers to deliver particular drugs to customers. Based on the investigation and drug seizures, investigators believe

roja is code for cocaine, negra/marron is code for fentanyl, and agua and tina are code for methamphetamine.

12.     Investigators have identified a number of Target Subjects who are working with or being supplied by the CUELLO-NUNEZ DTO, phones and vehicles used by the Target Subjects to facilitate their drug trafficking activities, and locations believed to be used to store drugs or drug proceeds. Investigators have seen Target Subjects using multiple vehicles including a Honda CR-V ("Honda CR-V"); a white 2014 Ford Explorer ("Ford Explorer"); a 2006 grey Nissan Murano ("Nissan Murano"); a 2014 white Jeep Grand Cherokee ("Grand Cherokee"); and a 2012 white Jeep ("White Jeep"). Other than the Honda CR-V, which is registered to Gabriel Rivera-Rosa (CUELLO-NUNEZ's assumed identity), all of the other vehicles are in the names of third parties. The Target Subjects have also used other vehicles and asked others to rent vehicles for them. Investigators have also identified locations that are frequented by the Target Subjects. It is believed that CUELLO-NUNEZ and his wife, Claudia Martinez, a/k/a "Emeira" ("EMEIRA") recently moved to Target Location #1; ██████████████████████ Target Location #2; and that JOSE resides and stores drug proceeds at Target Location #3. EMIRA was intercepted numerous times during the investigation discussing wire transfers, which are believed to be drug payments, and shipped packages, which are believed to contain drugs. As detailed herein, investigators seized methamphetamine and fentanyl from JOSE VAZQUEZ, who stored drugs for the DTO. WANDER was employed as a drug courier.

        November 17, 2022: Investigators seize fentanyl and cocaine from SANCHEZ and ████

13.     On November 17, 2022, at 8:26 p.m., SANCHEZ received an incoming call over Target Telephone 3 from ██████. ██████ told SANCHEZ to wake up because they needed to "go up there." SANCHEZ said he was getting up ("So I'm going to get dressed buddy.").

Investigators believed that ███████ told SANCHEZ that they needed to deliver drugs to customers who were located north of Massachusetts, believed to be in Maine. Investigators used the GPS tracking device previously installed on the Ford Explorer, which was used by the DTO to deliver drugs, to locate the Explorer. The data indicated it went to 14 Milton Avenue in Dorchester and then was traveling northbound in New Hampshire. Investigators requested that the New Hampshire State Police stop the Explorer. At approximately 12:00 p.m., the State Police stopped the Explorer in Greenland, New Hampshire.

14.     During the stop, SANCHEZ told the trooper that he had user quantities of drugs in the car and handed them over. The trooper informed SANCHEZ and ███████ that the Explorer would be towed because neither was the registered owner. After the Explorer was towed to a New Hampshire police barracks, investigators searched it and located approximately 54 "fingers" of suspected drugs, which investigators know is a common manner in which fentanyl is sold in 10 gram quantities. The 54 fingers field tested positive for fentanyl/methamphetamine and weighed approximately 560 grams. Investigators also recovered a clear bag containing approximately 100 grams of an off-white rock-like substance that field tested positive for cocaine. The drugs were hidden in an area near the air filter.[1]

15.     At 2:35 p.m., SANCHEZ called WANDER and asked WANDER to pick him up at ███████'s residence ("Come get me . . . At ███████'s. Come. Hurry."). WANDER asked if SANCHEZ and ███████ had delivered drugs to their customers north of Boston ("Didn't you guys go up there today?"), and SANCHEZ said he would explain in person ("Come get me. I'll tell you. I'll explain you.").

---

[1] All of the drugs seized during the investigation were sent to the DEA Laboratory for analysis; the results of which are pending.

16.     At 3:29 p.m., SANCHEZ called ███ to discuss the car stop. SANCHEZ said that the registered owner of the Explorer had a prior drug conviction, which was why he thought the car was stopped ("I think that Esther did jail time for drugs too . . . Yes, she did jail time for drugs. I am thinking that came out and you see the 22 years old guy from New York, you understand me. And that's why they didn't give us the SUV back and they took it to check it. You are right. "). ███ asked if they would be arrested if investigators found the drugs ("They would take us to court?"), and SANCHEZ replied, "Yeah." ███ said he would not go to court if charged ("Would you go to court? I won't go."). SANCHEZ said they should "pray that they don't find it."

SANCHEZ called CUELLO-NUNEZ to discuss the car stop with CUELLO-NUNEZ and ███.

17.     Later on November 17, 2022, at 5:58 p.m., SANCHEZ used Target Telephone 4 to call CUELLO-NUNEZ and ███ to discuss the car stop. SANCHEZ told CUELLO-NUNEZ that a drug customer, Nicole Collins, was afraid to rent a car for him ("Nicole is afraid to rent the car. She is nervous. She does not dare. She does not want to do it.").  SANCHEZ said he told WANDER not to worry about the stop because the address on his ID card was "14 Milton" and the trooper did not say the Ford Explorer was being taken to be searched ("14 Milton on the ID. But we are not going to worry because he never told me that they were going to take the car for an investigation, if anything, I swear that I will turn myself in, take a taxi and tell him."). CUELLO-NUNEZ asked what the trooper said was going to happen with the Ford Explorer ("What did they say about the SUV?"). SANCHEZ repeated that he was not told that the vehicle would be searched and that it was towed because the registered owner was not in the vehicle ("They never told me that they are going to take it for further investigation. He took it because the SUV is not in our name and is going to be towed. The owner has to go and get it. Those are the words he said.").

18.     SANCHEZ said he was going to have the registered owner of the car call the New Hampshire police to ask about the Ford Explorer ("I am saying that it has to be done by Esther, because the car is not ours, ███. If we do it, then they are going to figure things out."). After the call ended, SANCHEZ used Target Telephone 4 to call Nicole Collins asking her to rent a car for him ("Can you rent us a car?").

19.     At 7:34 p.m., (call #1098), CUELLO-NUNEZ called SANCHEZ, and the call was intercepted over Target Telephone 4. CUELLO-NUNEZ told SANCHEZ that Nicole Collins was desperate to receive drugs ("Nicole is desperate. How long until you are there?"). SANCHEZ replied that he was four minutes away ("Yeah, in four minutes."), but was currently delivering to a drug customer whose address was "76" ("We are here at 76, call him."). CUELLO-NUNEZ told SANCHEZ that another customer wanted four "negras" (Spanish word for black) and one "roja" (Spanish word for red). SANCHEZ asked if the customer lived near Collin's ("Around Nicole?"), and CUELLO-NUNEZ affirmed. Investigators could hear WANDER in the background telling CUELLO-NUNEZ to call the customer who lived at "76" on Roman.

<u>January 11, 2023: Investigators seize methamphetamine and fentanyl</u>

20.     On January 10, 2023, investigators intercepted a call between CUELLO-NUNEZ (using Target Telephone 6) and ███ (using Target Telephone 10) in which CUELLO-NUNEZ asked ███ if he would pick up a package of drugs ("Are you going to want to pick up one of those packages?"). ███ agreed ("Well, if you send one around here, I'll pick it up man."). CUELLO-NUNEZ referenced a drug package that had been sent to a male named "Tommy" ("One of the ones Tommy gave me will arrive tomorrow, but I don't think Tommy will go get any of those."). Later that night, CUELLO-NUNEZ called ███ to arrange a trip to Tommy's to pick up a drug package ("Come down so we can go to Tommy to get the stuff.").

21.     On January 11, 2023, ███ called JOSE VAZQUEZ and directed him to pick up a drug package ("come for the stuff."). At 9:33 a.m., ███ called WANDER advising him that he was stopping at WANDER's residence to pick up a key to a "white SUV." At 10:39 a.m., ███ called JOSE VAZQUEZ, and JOSE VAZQUEZ asked for the address where the package was to be picked up ("send me the address"). At 10:41 a.m., ███ sent a text message to JOSE VAZQUEZ with the address ("126 brook ave Dorchester").

22.     Investigators went to 126 Brook Avenue, and at 12:08 p.m., they saw ███ pick up a UPS package that had just been delivered and left in the front of 126 Brook Avenue. ███ handed the package to JOSE VAZQUEZ, who placed the package in the trunk of his vehicle and departed the area. At the direction of investigators, a Massachusetts State Police trooper stopped JOSE VAZQUEZ's vehicle and recovered the package from the trunk. While the search was ongoing, JOSE VAZQUEZ called ███ and told him about the stop. During the call, JOSE VAZQUEZ asked ███ what was in the package, and ███ replied ("One auga."). JOSE VAZQUEZ asked, "Just one?" and ███ replied, "More than a few." Investigators searched the package, which contained approximately 10 pounds of a substance that field tested positive for methamphetamine.

23.     In calls intercepted later that day between CUELLO-NUNEZ (using Target Telephone 6) and ███ (using Target Telephone 10), the two discussed the seizure from JOSE VAZQUEZ. ███ told CUELLO-NUNEZ to move additional drugs ("Get out of there right away. Because that was a lot of stuff, and he is not going to handle any pressure."). CUELLO-NUNEZ replied, "10 pounds of crystal is a lot . . . Let me call . . . Tommy to tell him as well." Investigators believed the DTO was planning to retrieve additional drugs that were stored at JOSE VAZQUEZ's residence and at a separate storage location.

24.     After locating JOSE VAZQUEZ, DEA investigators stopped his vehicle and seized approximately one and a half kilograms of a substance that field tested positive for fentanyl. Investigators identified a storage facility located at 41 Norwood Street in Dorchester where JOSE VAZQUEZ rented a unit. Investigators searched the unit and seized an additional four kilograms of suspected fentanyl and metal equipment used to press drugs from the storage unit.

January 13, 2023: Investigators seize methamphetamine

25.     On January 12, 2023, investigators received information that a package containing drugs was being delivered the following day to 17 Verrill Street in Mattapan.

26.     On January 13, 2023, investigators went to the UPS office in Norwood, Massachusetts and took possession of a package destined for 17 Verrill Street. Pursuant to a warrant, investigators opened the package, which contained approximately 10 pounds of a substance that field tested positive for methamphetamine.

27.     Before CUELLO-NUNEZ discovered that the package had been seized by investigations, he sent SANCHEZ and WANDER to the area of 17 Verrill address to wait for the package.  On January 16, 2023, at 10:30 a.m., CUELLO-NUNEZ called SANCHEZ (over Target Telephone 8). CUELLO-NUNEZ told SANCHEZ to be prepared to pick up a drug package ("Be attentive to your phone because there is something over there that needs to be picked up."). SANCHEZ asked where the package was being delivered ("Over there, over there, over here?"). CUELLO-NUNEZ replied that WANDER knew the address ("Yeah, Wander knows where it is."). SANCHEZ said he would get the address from WANDER ("Oh, well then when Wander sees me. Okay, bye."), and CUELLO-NUNEZ told SANCHEZ to call WANDER ("So call him and tell him."). Calls intercepted later that day indicated that WANDER was waiting for the package and the location data for SANCHEZ's phone also indicated it was in the vicinity of 17 Verill Street.

28.     At 11:16 a.m., WANDER called CUELLO-NUNEZ (over Target Telephone 6).
WANDER asked CUELLO-NUNEZ to check the arrival status of a package ("Check if the
package arrived.") and CUELLO-NUNEZ agreed ("Alright."). Later that day, at 5:30 p.m.,
WANDER called CUELLO-NUNEZ and said he had to go somewhere to pick up money for a
wire transfer ("Don't forget I have to go to the small Plaza to get the money for the wire.").
CUELLO-NUNEZ confirmed the transfer place was open until 9:00 p.m. ("Yeah, they close at
9:00 today."). WANDER said he was still waiting for the package to be delivered ("That stuff still.
You already know. I am still here on it, and nothing."). SANCHEZ, who was with CUELLO-
NUNEZ, said a previous package had been delivered late in the day ("Is until 8:30, he arrived late
the other day. I stayed with him."). CUELLO-NUNEZ said the tracking information stated the
package was enroute ("But it says it is on its way, still."). WANDER asked if any customers had
called to order drugs ("Dude, so the people? They are not calling?"). CUELLO-NUNEZ replied
that he had told SANCHEZ that no customers were calling ("I was just telling Bori, no one has
called today. No one, no one."). WANDER said the customers would call later because they had
bought a lot of drugs the night before ("They'll start calling later, but the thing was they called last
night for a lot. They all grabbed five or four."). SANCHEZ said that the customers might have
bought from a different supplier ("Maybe someone else is selling them over there.").

29.     At 6:40 p.m., WANDER again called CUELLO-NUNEZ over Target Telephone 6.
WANDER said he was still waiting for the package ("Dude, nothing yet. You already know.").
CUELLO-NUNEZ told him to continue to wait ("Give it a few more minutes, it is almost 7:00."),
and WANDER told him to track the package ("You have to track it and see where it's at.").
CUELLO-NUNEZ said the tracking information stated the package was out for delivery and he
had already told Cipriano that it was late ("My brother, it says it is out for delivery. I already told

Cipriano that's screwed up."). WANDER agreed to wait ("Okay, I am going to wait here until around 7:20 and see.").

<u>WANDER, SANCHEZ, and CUELLO-NUNEZ discussed the fentanyl seizure</u>

30.     After the seizure from JOSE VAZQUEZ, CUELLO-NUNEZ sent SANCHEZ and WANDER to the storage unit to search for the kilograms of fentanyl that had been seized. On January 17, 2023, at 2:29 p.m., CUELLO-NUNEZ called SANCHEZ over Target Telephone 8. CUELLO-NUNEZ told SANCHEZ to tell JOSE VAZQUEZ that he (CUELLO-NUNEZ) went with SANCHEZ to the storage unit and discovered that the fentanyl was missing ("Tell him that I went with you. Tell him, 'I went with Chompi and nothing was found. Go look for the shit.'"). WANDER, speaking over the phone, said that JOSE VAZQUEZ must have taken the fentanyl ("That dude removed that from there. There is nothing there."). SANCHEZ said he did not want to talk about the missing drugs over the phone ("Fuck, I don't even want to talk. I will talk to you later in person."). CUELLO-NUNEZ asked if SANCHEZ saw the drug presses in the storage unit ("Did you see the metal things? You didn't see the metals?"). SANCHEZ said they were not there ("No, I didn't see that there."). SANCHEZ said he suspected JOSE VAZQUEZ had taken the drugs and the presses ("I'm telling you there is something suspicious. I'm to the point where I'm going to tell it to him how it is, Jose."). CUELLO-NUNEZ said SANCHEZ talked about confronting JOSE VAZQUEZ but has not ("You say you're going to tell him, but you don't say anything."). SANCHEZ said he would tell JOSE VAZQUEZ to find the drugs because he did not believe law enforcement had seized them ("Jose look for that shit, because they have not taken anything from there."). WANDER said law enforcement would have taken the scales if they had seized the fentanyl ("They would have taken the scales."). SANCHEZ said he did not look for the scales when he was in the unit ("I didn't see the scales because that's not what I'm looking for.").

CUELLO-NUNEZ and SANCHEZ discussed a drug delivery to Maine.

31.     On January 21, 2023, at 7:10 p.m., SANCHEZ used Target Telephone 8 to send a text message to CUELLO-NUNEZ that read, "Chu is going with me." At 9:39 p.m., CUELLO-NUNEZ called SANCHEZ. CUELLO-NUNEZ said that ███████ had prepared drugs for a customer and asked if SANCHEZ found someone to accompany him to deliver the drugs ("████, already made that. You found someone to go with?"). SANCHEZ confirmed ("Chucho, is going with me."). CUELLO-NUNEZ asked what time SANCHEZ was planning to leave ("What time?"), and SANCHEZ said he was planning to leave the following day ("I told Chucho, I will call him now and tell him were going to leave tomorrow at around 6:00."). CUELLO-NUNEZ agreed ("Alright."). SANCHEZ repeated that Chucho would drive him to deliver the drugs ("Yes, I will call him now. He will go. He told me he will go. He will help me. And Chucho has had his license for over 60 years; 55 years. That license has never."). CUELLO-NUNEZ asked which car SANCHEZ planned to take ("Alright. Are you guys going in your vehicle or this one?"). SANCHEZ said he would have to use CUELLO-NUNEZ's vehicle ("He does not have a vehicle. We have to go in yours."). CUELLO-NUNEZ said he would bring the drugs to SANCHEZ and explain how to package them ("Alright, then. I'm going to drop it off around here, and I will explain how the stuff will be done . . . It would be better if we meet now, so I can explain to you how the thing is done, so you can do it."). CUELLO-NUNEZ told SANCHEZ to have WANDER pick him up ("Call Wander, so he can pick you up."). SANCHEZ agreed ("I'm going to call him, so he can pick me up.").

WANDER coordinated drug deliveries and wire transfers.

32.     On January 14, 2023, at 5:04 p.m., WANDER called Target Telephone 6 and spoke with CUELLO-NUNEZ. WANDER asked if a drug customer named Grande had called ("I was

saying, to see if Grande called so that I can leave the thing around there."). CUELLO-NUNEZ replied that Grande had not called yet and he was concerned that something had happened ("Let me call him and see. Wander, he has not called. Maybe something happened to him?"). WANDER said Grande might have fallen asleep ("He falls asleep."). CUELLO-NUNEZ said he would call Grande and asked if WANDER had delivered drugs to Nicole Collins ("Let me call him again. And Nicole, did you go over to Nicole?"). WANDER confirmed he had delivered drugs to Collins ("I saw her already. She grabbed six.").

33.     On January 15, 2023, at 12:18 p.m., WANDER called CUELLO-NUNEZ over Target Telephone 6. CUELLO-NUNEZ told WANDER to give a vehicle to SANCHEZ ("I was calling you so you can give the thing to Bori . . . the car."). WANDER said he had spoken to SANCHEZ ("Yes. I spoke with him."). CUELLO-NUNEZ told WANDER to count money and let him know how much money he was going to give SANCHEZ to wire ("Yes and count the money there please . . . Let me know how many you are going to give him."). WANDER asked if he was giving money to SANCHEZ ("To Bori?"). CUELLO-NUNEZ confirmed that he needed to make a wire transfer and complained that WANDER's name was flagged in the system, and he could not send money using WANDER's name ("Yes. Dude, I have to make a deposit for something and it's telling me that you're blocked. Are you blocked?"). WANDER said that money from a previous wire transfer had been returned to him ("You know that day that I went to deposit that money it was returned to me."). CUELLO-NUNEZ said he needed WANDER to deposit money into an account, which was cheaper than sending a wire transfer ("It's a deposit to an account, not sending it, it's a deposit. That can be done at once. They even charge less for that."). WANDER said he was planning to leave to make the deposit with SANCHEZ ("Yes, I'm going

to get ready to go with Bori.") and asked how much he was to deposit ("How much am I putting?"). CUELLO-NUNEZ replied that $2,000 needed to be deposited ("2,000 has to be sent.").

34.     Later that day at 1:32 p.m., WANDER called CUELLO-NUNEZ over Target Telephone 6. WANDER asked which bank account he should use for the deposit ("Which Bank is it dude?"), CUELLO-NUNEZ replied, "Bancomer, the card is right here. Bancomer." WANDER said the deposit card was for Bancoppel ("But the card says Bancoppel."). CUELLO-NUNEZ acknowledged ("Let me check it. Yes, Bancoppel") and told WANDER to make the deposit using Western Union ("A deposit, you heard? . . . Via Western Union."). WANDER asked where the money was going ("To where? In case they ask me.") and CUELLO-NUNEZ replied, "To Mexico. . . . It has, the deposit number right on the card . . . And the name as well." At 1:42 p.m., WANDER sent CUELLO-NUNEZ a text message asking which city in Mexico the money was being sent ("What city is this going to?"), and CUELLO-NUNEZ replied, "Mexico, DF."

35.     On January 15, 2023, at 7:42 p.m., WANDER called CUELLO-NUNEZ over Target Telephone 6. WANDER put a customer, Nicolas Higgins, on the phone to discuss payment for the drugs. CUELLO-NUNEZ told Higgins ("Nico") to pay him the following day for the drugs. Higgins confirmed he would pay the following day and confirmed that he was buying methamphetamine and fentanyl ("I need two blues too. So, I need 10 blacks, two blues. I got you tomorrow, my word."). CUELLO-NUNEZ agreed ("Okay, okay. Tell Wander, to give you. No problem.").

36.     On January 18, 2023, at 4:29 p.m., SANCHEZ (using Target Telephone 8) called and spoke with WANDER. SANCHEZ told WANDER he was waiting for a drug customer at a location ("I am by 14 of Edmond."). WANDER affirmed ("Alright."). At 4:35 p.m., SANCHEZ sent text messages to WANDER complaining that he was still waiting for the customer ("Hey, I

am not going to be here for 2 hours, bro.") and was concerned about the area ("This street is kind of suspicious."). WANDER replied by text that he had already called the customer ("I already called them."). SANCHEZ asked for the address ("But give me the address.").

37.     On January 27, 2023, at 7:10 p.m., WANDER called Target Telephone 8 and spoke to SANCHEZ. WANDER asked, "What is the name of the thing, Bori?" SANCHEZ replied that it was a blender that grinds ("A grinder. Tell her 'a grinder' . . . A blender that grinds."). WANDER told SANCHEZ the store he was in did not sell that type of blender ("They don't have it at this store."). In the background, a female who was with WANDER was overheard saying he could purchase the blender "online" at "Target." Based on the investigation, I believe WANDER was purchasing a blender that is used by the DTO to mix drugs.

<u>JOSE fielded drug calls and collected drug proceeds for the CUELLO-NUNEZ DTO</u>

38.     During the course of the investigation, investigators have intercepted JOSE over CUELLO-NUNEZ's phones numerous times. Those calls demonstrate that JOSE is involved in the distribution of drugs, the collection of drug proceeds which are pooled together to purchase additional drugs, and alien smuggling.

<u>JOSE and CUELLO-NUNEZ discussed drug orders and human smuggling.</u>

39.     On November 13, 2022, at 11:50 a.m., JOSE called Target Telephone 7 and spoke with CUELLO-NUNEZ. JOSE told CUELLO-NUNEZ that a drug customer was calling him ("Alicia is calling you."). CUELLO-NUNEZ told JOSE to send her to Rosedale Street ("I'll call the guys in 25 minutes."). At 12:33 p.m., CUELLO-NUNEZ called JOSE back and told him to call the female customer and let her know his couriers were ready ("Call the woman."). JOSE agreed and said he had told her to go to Rosedale in 25 minutes ("Alright. Let me call her. I told her 25 minutes like you told me."). CUELLO-NUNEZ replied, "Call her. The guys are there."

40.     On December 28, 2022, at 12:25 p.m., JOSE called Target Telephone 6 and spoke to CUELLO-NUNEZ. JOSE said that a female customer named Alicia was calling him ("Alicia is calling you."). CUELLO-NUNEZ said his phone was dead ("The phone has to be disconnected. It's without battery."). JOSE directed CUELLO-NUNEZ to turn the phone on ("Turn it on and call her."). CUELLO-NUNEZ agreed ("Tell her I'll call her shortly.").

JOSE asked CUELLO-NUNEZ for cocaine which a customer wanted.

41.     On December 31, 2022, at 10:58 a.m., CUELLO-NUNEZ used Target Telephone 6 to call JOSE. JOSE said that a drug customer called asking to buy drugs through JOSE ("Rocco called me asking me if he could get something through you. And I told him, 'I don't know, let me call him."). CUELLO-NUNEZ asked if the customer wanted cocaine ("Arriba?"), and JOSE confirmed ("Yes."). CUELLO-NUNEZ said he could call someone to get the cocaine and asked how much the customer wanted ("I can call a person. And how much he needs?"). JOSE replied, "One little thing." CUELLO-NUNEZ agreed and said he had to purchase more for himself ("Okay. I have to buy anyway . . . Tell him that not right now, but in the afternoon. I am going to be good with that in the afternoon. But he knows is for sure and good stuff."). JOSE agreed ("Oh. Okay.").

JOSE called to collect drug money from CUELLO-NUNEZ.

42.     On January 2, 2023, at 3:24 p.m., JOSE called CUELLO-NUNEZ, and the call was intercepted over Target Telephone 6. JOSE asked if he and CUELLO-NUNEZ were going to be contributing money to the pool which is used to pay for additional drug shipments ("Are we making a payment for the money pool today?"). CUELLO-NUNEZ affirmed ("Yes, we need to pay it."). JOSE asked where he should collect the money ("Where do you want me to stop by?"), and CUELLO-NUNEZ said the money was at his wife's mother's residence ("Go to Emeira. To her mom's.").

JOSE and CUELLO-NUNEZ discussed problems with smuggling aliens and JOSE asked
to pick up drugs from ████ .

43.     On January 7, 2023, at 11:48 a.m., JOSE called CUELLO-NUNEZ over Target

Telephone 6. CUELLO-NUNEZ told JOSE that something went wrong with a person he was

trying to smuggle into the country ("I was going to call you for that thing. They removed that thing.

It is not going to be possible with those people."). JOSE replied, "They removed that already?"

CUELLO-NUNEZ confirmed ("Yes"), and JOSE said he would let someone know ("Okay, I will

tell her."). CUELLO-NUNEZ said if the person attempted to enter the country she would be

deported and she would lose the money she paid to be smuggled ("Yes, because otherwise they'll

return her so the money will be a waste."). CUELLO-NUNEZ said things were dangerous along

the route in Mexico where people were being smuggled ("It is very dangerous around there. You

know that they grabbed El Chapo's son . . . And they are burning everything around there,

kidnapping people and such. You know. I myself do not want to commit to things there now . . .

It is necessary to wait for at least a month or so."). JOSE said he would pass along the information

and asked if there was another location where a person could be smuggled ("I will tell her. Shit!

And the other place, then it is too expensive?"). CUELLO-NUNEZ agreed ("Yes."). JOSE asked

how much it would cost to smuggle the person through a different location ("Okay, and about how

much on the other place?"). CUELLO-NUNEZ said he was smuggling another woman at that

location ("Dad, that's where I am passing Elaini through. I am going to test it around there and she

came bad, but you know she has her thing . . . Her ID."). JOSE said he thought identification

documents could be issued ("Oh I thought that could be issued."). CUELLO-NUNEZ explained

that he was going to start using a different method to smuggle people ("They do a paper there,

mom said. . . Kind of like she lost the documents. With a notary and things, and with that they

board her . . . I am going to start getting in that way. That way, you spend less, you spend like

6,000 bucks and something . . . We can enter here through there."). JOSE agreed ("Yes, if we go

that way, it is faster."). CUELLO-NUNEZ explained that the person needed to get a visa first ("I

am going to, but it is necessary to deposit for the visa right away. It is necessary to deposit 3,500

ahead . . . In three weeks, they give her the visa."). JOSE said he would tell the person to wait to

see if the new method worked ("No, but I am going to tell her to wait for Elaini and see.").

44.     JOSE then told CUELLO-NUNEZ he needed drugs ("Look, I needed something.").

CUELLO-NUNEZ said he would call his guy ("Alright, let me call the guy."). JOSE said he would

pick up the drugs ("But I rather go pick it up, you heard?"). CUELLO-NUNEZ said he would call

██████ ("Alright, let me call ████, then because he is in ████"). Later, at 1:03 p.m., JOSE

called Target Telephone 6 and asked CUELLO-NUNEZ to tell ████ that he had arrived to pick

up the drugs ("Call ████ and tell him I'm here in the back."). CUELLO-NUNEZ agreed

("Okay.").

     JOSE and CUELLO-NUNEZ discussed collecting drug money that they pool together to
     purchase additional drugs.

45.     On January 16, 2023, at 2:57 p.m., JOSE called CUELLO-NUNEZ over Target

Telephone 6. JOSE asked if they were going to send money to pay for a shipment of drugs ("Are

we going to pay the money pool?"), and CUELLO-NUNEZ affirmed ("It needs to be paid."). JOSE

asked when he could stop by to collect the money ("When should I stop by?"). CUELLO-NUNEZ

replied he would call JOSE back ("Hold on, let me see. I'll call you back."). At 3:05 p.m.,

CUELLO-NUNEZ used Target Telephone 6 to call Target Telephone 15. CUELLO-NUNEZ told

JOSE to go to "Felix's" to pick up money, believed to be drug proceeds ("Stop by Felix or around

there . . . they will hand it to you up there."). JOSE agreed ("Alright").  Later, at 3:44 p.m.,

CUELLO-NUNEZ used Target Telephone 6 to call JOSE over Target Telephone 15. JOSE said

he had arrived ("I'm here. But I haven't gone up yet. I'm down here."). CUELLO-NUNEZ said

that someone was going to give JOSE money ("Alright, he is going to hand you some money. Count it and take the money you need from there."). CUELLO-NUNEZ told JOSE to only take $500 because he needed money to pay for a drug shipment ("Take 500 only, because I have to save up some money for these people."). JOSE agreed ("It's alright. It's no problem."). CUELLO-NUNEZ told JOSE to take his and ███████'s money which was being used to pay for a prior drug shipment ("And take ████'s and my money. There will only be one payment left after this one."). JOSE told CUELLO-NUNEZ he had two more payments to make ("When you pay this one, there'll be two more payments."). CUELLO-NUNEZ said he might not get the drug shipment because he did not have the money to pay for it ("Two? Oh, I'm not going to get it."). JOSE suggested he purchase a smaller quantity of drugs ("You're the one who knows, dude. If you need it, you can take it, but a lower amount."). CUELLO-NUNEZ agreed, saying he would only purchase 1,000 grams ("I may do 1,000 next time."), and JOSE agreed ("Yeah, do less. Of course.").

46.     Later that day at 4:50 p.m., JOSE called CUELLO-NUNEZ, and the call was intercepted over Target Telephone 6. JOSE told CUELLO-NUNEZ he left $2,740 that he had collected and took $400 from the total amount ("Erison, I left the other one there. I left 2,740 and I took four."). CUELLO-NUNEZ agreed ("Okay."). JOSE asked if he should contact a drug customer who contributes to the money pool to see if the customer could pay $20,000 into the money pool ("You want me to talk to this guy and see if he can give you the 20 this week? And he can take the two weeks that are left?"). CUELLO-NUNEZ agreed, explaining that he owed suppliers for the drugs that had been seized ("It's better if he can do it that way, because I am involved with these people that are, you already know."). JOSE agreed ("That is why I am telling you."). CUELLO-NUNEZ explained that he had already sold a lot of the drugs he had on hand ("I

haven't told you, but I have gone through a thousand things."). JOSE acknowledged ("Mm-hmm. Well . . . Okay, I am going to talk to him and see if he can do it."). CUELLO-NUNEZ agreed ("Okay.").

47.     On January 18, 2023, at 12:19 p.m., JOSE called Target Telephone 6. JOSE told CUELLO-NUNEZ he was meeting with someone in Jamaica Plain to pick up money to contribute to the money pool ("The guy with the money pool will meet me in a bodega in Jamaica Plain, to give me the money."). CUELLO-NUNEZ acknowledged ("Okay."). JOSE said the customer delivered $14,000 and that JOSE told the customer he would give the customer an additional two weeks to add again to the money pool but that CUELLO-NUNEZ was going to give him more drugs ("I told him to deduct two weeks and that you are going to give him stuff of the 20. So he left 14."). CUELLO-NUNEZ asked if they were going to resume collections for the money pool that week or the following ("But are we going to start not this week but the next one?"). JOSE repeated that the customer had contributed $14,000 ("He left 14 there."). Later in the call, JOSE told CUELLO-NUNEZ that when it was the customer's turn to pay into the money pool, CUELLO-NUNEZ should just pay ████'s portion ("No, not this week because you have to play dumb when it is his turn to pay this week's money pool. Just pay ████ CUELLO-NUNEZ complained that ████ was behind six weeks in contributing to the money pool ("And I'm going to talk with ████ too, because he left and we are not doing absolutely anything. He left for New York . . . and he doesn't want to deal with anything. and he owes six weeks of money pool, and I'm not going to pay his part."). JOSE replied, "So he owes six weeks of money pool? damn!").

**Target Locations**

**_Description and Criminal Activity at Target Locations_**

21

**(1)  CUELLO-NUNEZ's Residence – Target Location #1**

Description of Target Location #1

48.     **1000 Harvard Street, Apt. 7, Mattapan, Massachusetts** is a gray three story condominium, with white trim and a dark gray roof. The entry door is a white storm door and a white entry door with the bronze colored numbers affixed to the left side of the door.  The condominium has a dark gray shingle roof. Target Location #1 is Apartment 7 on the first apartment. A detailed description and photograph of Target Location #1 appear in Attachment A-1, which is attached hereto and incorporated herein by reference.

49.     Based on physical and electronic surveillance and intercepted calls, I believe CUELLO-NUNEZ lives at this residence with his wife, EMEIRA. The phone location data for CUELLO-NUNEZ's most recent phone ((857) 243-1857) indicated it was in the vicinity of 1000 Harvard Street most nights and the early morning hours, including most recently as February 6, 2023. On February 6, 2023, investigators arrested CUELLO-NUNEZ inside of Target Location #1.

Link to Criminal Activity

50.     As detailed in this affidavit, CUELLO-NUNEZ is the leader of a DTO that purchases and distributes large quantities of methamphetamine, fentanyl, and cocaine and collects drug proceeds on behalf of the Sinaloa DTO. CUELLO-NUNEZ has been intercepted on a daily basis discussing the acquisition and distribution of drugs and the collection of drug debts. CUELLO-NUNEZ employees couriers who assist him in his large-scale drug distribution and money laundering business. Since November 2022, CUELLO-NUNEZ has been intercepted using at least six different phones during the course of this investigation. As detailed above, investigators seized a methamphetamine package from JOSE VAZQUEZ and fentanyl from his

storage unit. After the seizure, CUELLO-NUNEZ was intercepted discussing the seizures with

████████, SANCHEZ, and WANDER. Accordingly, I believe that evidence of CUELLO-

NUNEZ's ongoing drug trafficking and money laundering activities, including records/ledgers

detailing drug transactions and drug debts, customer lists, phones used to conduct his drug

business, records of wire transfers, and drug proceeds, as set forth in Attachment B, will be found

at Target Location #1.

**(2)** ████████████ **– Target Location #2**

Description of Target Location #2

51.   ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████

52.   ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

Link to Criminal Activity

53.

**(3)**     **JOSE's Residence – Target Location #3**

Description of Target Location #3

54.     73 Savin Street, Floor 3, Roxbury, Massachusetts ("73 Savin Street") is a multi-unit, three story residential building. The building is yellow with brown trim. The front of the building has wooden steps leading to a front porch. The front entry door is a white door with two windows, and  the number "73" is affixed to the middle of the front entry door. The building has a brown shingle roof. Target Location #3 is the unit on the third floor of 73 Savin Street. A detailed

description and photograph of Target Location #3 appear in Attachment A-3, which is attached hereto and incorporated herein by reference.

55.     I believe Target Location #3 is JOSE's residence because the location data for the phone JOSE was intercepted using (617) 602-3534 (the 3534 Phone) throughout this investigation indicated it was in the vicinity of 73 Savin Street, in the nighttime and early morning hours, including most recently as February 6, 2023. On February 1, 2023, investigators executed a warrant to identify the exact location within 73 Savin Street that the 3534 Phone was located. The exact location data indicated that the phone was inside of 73 Savin Street. The 3534 Phone is subscribed to "Yuleyki Peguero," at Target Location #3 (73 Savin Street, Apt. 3, Roxbury Massachusetts). Finally, a public records database used by law enforcement lists "Jose Cuello" as the occupant of Target Location #3.

Link to Criminal Activity

56.     Based on physical and electronic surveillance, precise location data for phones used by JOSE and intercepted calls, I believe JOSE resides at Target Location #3 and stores drugs proceeds at this location. As detailed above, JOSE is believed to be intimately involved in CUELLO-NUNEZ's drug trafficking business. JOSE has fielded drug calls from customers, placed drug orders for customers, and discussed the collection of drug proceeds from DTO customers. Based on the intercepted calls, investigators believe JOSE collects the proceeds which he then pools together to purchaser additional drugs for members of the DTO. Intercepted calls further indicate that JOSE is involved in alien smuggling.

57.     On February 6, 2023, at approximately 10:30 a.m., investigators arrested JOSE as he exited 73 Savin Street. JOSE identified the third floor apartment (Target Location #3) as his residence.

58.     Based on the investigation to date, JOSE's involvement in drug trafficking, money laundering and alien smuggling, I believe there is probable cause to believe that evidence of JOSE's ongoing drug trafficking activities, including drug proceeds, drug ledgers, records of drug trafficking, money laundering, and alien smuggling as set forth in Attachment B-1, will be found at Target Location #3.

<u>DRUG TRAFFICKERS' USE OF RESIDENCES AND CELLULAR TELEPHONES</u>

59.     Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

60.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances

can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

61.     Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

62.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences. Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

63.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and

businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

64.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

65.     Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B and B-1 on their cellular telephones.

66.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones. In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is,

therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

67.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

68.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time

before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

69.    I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the targets of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

a.  controlled substances;

b.  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

c.  books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d.  personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e.  cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files,

navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.   firearms and other dangerous weapons; and

i.   identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

UNLOCKING DEVICES USING BIOMETRIC FEATURES

70.    I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device, and/or content contained on the device, via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

71.    On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus,

in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

72.     The passcodes that would unlock CUELLO-NUNEZ, ███████, JOSE's, SANCHEZ's, EMEIRA's, and WANDER's device(s) (hereinafter, the "Target Devices") found during the search of the Target Locations are not currently known to law enforcement.  However, during the course of this investigation, a number of Target Subjects have used Apple iPhones to conduct their drug business.  Thus, it may be useful to press the finger(s) of the user(s) of the Target Devices found during the search of the Target Locations to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device, and/or content within the device,  for the purpose of executing the search authorized by this warrant.  The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

73.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Locations

to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

74.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of the Target Subjects or co-conspirators identified in this affidavit to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

75.     The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B-1. If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

76.     Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that the Target Subjects are engaged in drug trafficking. I believe that evidence of their drug trafficking offenses will be found inside each of the Target Locations and on certain cellular telephones seized therefrom.

## <u>CONCLUSION</u>

Based on the information set forth above, I believe probable cause exists to conclude that the Target Subjects have conspired to possess with intent to distribute, and to distribute 50 grams or more of methamphetamine, 400 grams or more of fentanyl, and cocaine, in violation of 21 U.S.C. §846, and that evidence of said criminal offense, as set forth in Attachments B and B-1 of

each of the respective search warrant applications for the Target Locations, will be found inside each Target Location.

I, Sean Geary, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

SEAN GEARY
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this ___th day of February 2023  Feb 6, 2023

HONORABLE JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS